# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## ON MOTION FOR REHEARING

---

## NO. 03-18-00578-CR

---

**Krystal Nicole Lerma, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 391ST DISTRICT COURT OF TOM GREEN COUNTY
### NO. D-17-0115-SA, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

We withdraw the opinion and judgment dated August 14, 2019, and substitute the following opinion and judgment in their place. We deny appellant's motion for rehearing.

A jury found appellant Krystal Nicole Lerma guilty of burglary of a habitation, and the trial court sentenced her to 27 years' imprisonment. In eight points of error, Lerma contends that the evidence was insufficient to support her conviction and that the trial court committed various errors in the jury charge. We will affirm the trial court's judgment of conviction.

### DISCUSSION

**Sufficiency of the Evidence**

In her first point of error, Lerma contends that the evidence was insufficient to support her conviction. "In assessing the sufficiency of the evidence to support a criminal

conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018) (internal quotation marks omitted). "We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Id.* at 608. "This familiar standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Id.* (internal quotation marks omitted). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (internal quotation marks omitted). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.*

Here, the indictment alleged that Lerma committed burglary by entering the habitation of Jimmy Andrew Gonzales without his effective consent with the intent to commit robbery. As relevant to this case, a person commits burglary if she enters a habitation without the effective consent of the owner with the intent to commit a felony other than theft. *See* Tex. Penal Code § 30.02(d). In addition, "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

At trial, the State presented evidence of the following:

- On the evening of September 12, 2016, Lerma entered Gonzales's home. Anthony Martinez was also present in the home when Lerma arrived.

2

- As Lerma was leaving the home, three men rushed inside. One of these men was Raymond Alvarado, Jr.

- Alvarado shot and killed Gonzales and Martinez.

- Police extracted a "Snapchat conversation" between Lerma and Alvarado from Lerma's phone. This record showed that, at 9:03 p.m. on the evening of the shootings, Lerma sent Alvarado the following messages: "I want a tv too. Idc[1] which one but I want one. If I can do my part & it goes thru, then I want a TV[.]" "My babies broke theirs so I really need one."

- Photos of Gonzales's home taken after the shootings showed multiple flat-screen televisions.

- Phone records showed that Lerma called Alvarado at 8:48, 8:52, and 9:20 p.m. and that she received a call from Alvarado at 9:30 p.m. The records also showed that Lerma missed a call from Alvarado at 10:00 p.m.

- A neighbor who heard gunshots called 911 at 10:28 p.m.

In addition, the State presented video recordings of two interviews between Lerma and police. In the first interview, Lerma denied that she went to Gonzales's home on the night of the shootings. According to Lerma, she was expecting Gonzales to come to her home that evening to pick up some food, but he never came. However, during the second interview Lerma confirmed the following:

- She had previously been in a sexual relationship with Gonzales, and he had lived with her for a while.

- She had been "really good friends with" Alvarado for a long time.

- Alvarado had told Lerma that he wanted to "beat up" and "rob" Gonzales. Lerma knew that Alvarado had problems with Gonzales because of an incident involving another woman.

- She knew that Alvarado had tried to "set up" Gonzales in the past.

---

[1] A detective testified that "IDC" stands for "I don't care."

3

- She spoke with Alvarado on the phone on the night of the shootings and told him that she was heading to Gonzales's home.

- After speaking with Alvarado, she knew that Alvarado wanted her to call him when she arrived at Gonzales's home because Alvarado wanted to rob Gonzales.

- She went to Gonzales's home to get some marihuana, because Gonzales was a drug dealer.

- As she was leaving Gonzales's home, Alvarado rushed past her into the home. She then ran away and did not look back. She did not call the police.

- She admitted that she should have taken Alvarado seriously, that she "should have known," and that she should have "said something." She stated, "[Gonzales is] dead because of me and [Martinez is] dead because of me." She denied that she intended to set them up and denied knowing that Alvarado wanted to kill Gonzales.

- She stated, "I don't want to go to trial" and asked if she could just "do like a plea deal or something."

Viewing this evidence in the light most favorable to the verdict, we conclude that a rational juror could have concluded that Alvarado entered Gonzales's habitation without his effective consent with the intent to commit robbery. Based on Lerma's prior knowledge that Alvarado intended to rob Gonzales, the phone records, the Snapchat conversation, the fact that Lerma denied going to Gonzales's home during her earlier police interview, and Lerma's admissions during her second interview, a rational juror could also have concluded that Lerma intended to promote or assist the commission of the offense by aiding Alvarado in entering Gonzales's home. Accordingly, we conclude that the evidence was sufficient to support Lerma's conviction, and we overrule her first point of error.

**Jury Charge Error**

In her second through eighth points of error, Lerma contends that the trial court committed various errors in the jury charge. We review alleged jury charge error in two steps:

4

first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *DeLeon v. State*, No. 03-18-00268-CR, 2018 WL 6837742, at *1 (Tex. App.—Austin Dec. 28, 2018, pet. ref'd). Here, Lerma did not object to the alleged errors at trial or request alternate instructions, so any error "will not result in reversal of the conviction without a showing of egregious harm." *Price*, 457 S.W.3d at 440. "The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm." *Swearingen v. State*, 270 S.W.3d 804, 813 (Tex. App.—Austin 2008, pet. ref'd). "Egregious harm is harm that deprives a defendant of a fair and impartial trial." *Price*, 457 S.W.3d at 440 (internal quotation marks omitted). Stated differently, "[j]ury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Arteaga v. State*, 521 S.W.3d 329, 338 (Tex. Crim. App. 2017).

*Comment on the Weight of the Evidence*

In her second point of error, Lerma contends that the trial court improperly commented on the weight of the evidence in violation of Texas Code of Criminal Procedure article 36.14 by including the following language in the jury charge:

> In judging the facts and the believability of the witnesses, you must apply the law provided in these instructions.
>
> . . . .
>
> While you should consider only the evidence, you are permitted to draw reasonable inferences from the testimony and exhibits that are justified in the light of common experience. In other words, you may make deductions and reach

conclusions that reason and common sense lead you to draw from the facts that have been established by the evidence.

These instructions are correct statements of the law. *See Watson v. State*, No. 03-19-00015-CR, 2019 WL 2939247, at *2 (Tex. App.—Austin July 9, 2019, no pet. h.) (mem. op., not designated for publication); *see also Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018) (noting that it is "the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts") (internal quotation marks omitted); *Boston v. State*, 373 S.W.3d 832, 836 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013) ("The jury, as the exclusive judge of the facts, is entitled to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom."). In addition, these instructions follow the Texas Pattern Jury Charges—more specifically, instructions which are included in the general charge, or abstract charge, to the jury. *See* State Bar of Tex., *Texas Criminal Pattern Jury Charges: The General Charge*, CPJC 2.1 (2018); *see also H.E. Butt Grocery Co. v. Bilotto*, 928 S.W.2d 197, 199, 200 (Tex. App.—San Antonio 1996), *aff'd*, 985 S.W.2d 22 (Tex. 1998) (noting that, while the Texas Pattern Jury Charges "are not 'law', they are heavily relied upon by both the bench and bar" and are "a widely accepted source throughout the legal community"). Consequently, these instructions are not "special instructions" and do not focus the jury's attention on a specific type or piece of evidence that may support an element of the offense. *See Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007) (generally, party is not entitled to a "special jury instruction relating to a statutory offense or defense" if that instruction "(1) is not grounded in the Penal Code; (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or defense") ; *cf. Brown v. State*, 122

6

S.W.3d 794, 797 (Tex. Crim. App. 2003) (concluding that instruction that "intent or knowledge may be inferred by acts done or words spoken" is improper because it "singles out a specific type of evidence and tells the jury it may infer an element of the crime"). We conclude that the trial court did not err in including these instructions, and we overrule Lerma's second point of error.

*Remaining Jury Charge Issues*

In her third point of error, Lerma contends that the trial court erred in including a definition of "recklessly" in the jury charge. Lerma notes that the indictment alleges that she entered a habitation with the intent to commit robbery, not that she actually committed robbery, and argues that one cannot intend to act recklessly.

In her fourth point of error, Lerma contends that the trial court erred in defining "knowingly . . . in terms of circumstances-surrounding-conduct" by including the following language: "A person acts knowingly, or with knowledge, with respect to the nature of her conduct or to circumstances surrounding her conduct when she is aware of the nature of her conduct or that the circumstances exist."

In her fifth point of error, Lerma contends that the trial court erred in "failing to instruct the jury that it must apply a result-of-conduct definition of 'with intent' to the law of parties" when it included the following instruction:

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.
>
> A defendant acts with intent to promote or assist in the commission of an offense when it is her conscious objective or desire to promote or assist in the commission of the offense.

7

In her sixth point of error, Lerma contends that the trial court erred in "failing to instruct the jury that it should apply only a result-of-conduct definition of 'with intent' to the charged offense of burglary with intent to commit robbery."

In her seventh point of error, Lerma contends that the trial court erred in "failing to instruct the jury that it should apply only a result-of-conduct definition of 'intentionally' or 'with intent' to the offense of robbery."

In her eighth and final point of error, Lerma contends that the trial court erred in "failing to instruct the jury that it should apply only a result-of-conduct definition of 'knowingly' or 'with knowledge' to the offense of robbery."

For the purposes of our analysis, we will assume, without deciding, that these jury instructions were erroneous in the ways that Lerma describes. Nevertheless, we will reverse the trial court's judgment only if we conclude that the court's errors caused Lerma egregious harm. *See Price*, 457 S.W.3d at 440. "In examining the record for egregious harm, we consider the entire jury charge, the state of the evidence, the closing arguments of the parties, and any other relevant information in the record." *Arteaga*, 521 S.W.3d at 338.

*Entire Jury Charge*

All of the errors about which Lerma complains in her third through eighth points of error occur in the abstract portion of the jury charge, not in the application paragraph. "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (noting that the application paragraph is "the heart and soul of the jury charge") (internal quotation marks omitted); *Isreal v. State*, No. 03-17-

8

00296-CR, 2018 WL 5305502, at *7 (Tex. App.—Austin Oct. 26, 2018, pet. ref'd) (mem. op., not designated for publication) ("We presume that the jury followed the instructions given. For that reason, when the application paragraph of the jury charge correctly instructs the jury on the law applicable to the case, error in the abstract instruction is not egregious.") (citations omitted); *Kuhn v. State*, 393 S.W.3d 519, 529 (Tex. App.—Austin 2013, pet. ref'd) (collecting cases and explaining, "In different contexts, Texas courts have repeatedly held that where the application paragraph of the charge correctly instructs the jury on the law applicable to the case, this mitigates against a finding that any error in the abstract portion of the charge was egregious."). "Generally, reversible error occurs in the giving of an abstract instruction only when the instruction is an incorrect or misleading statement of a law that the jury must understand in order to implement the commands of the application paragraph." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012).

However, some of the terms found in the application paragraph rely on definitions given in the abstract portion. For example, the term "robbery" in the application paragraph is tied to the definition of robbery in the abstract portion, which includes the mental state of recklessness. Accordingly, we conclude that the entirety of the charge weighs slightly in favor of a finding of egregious harm.

*State of the Evidence*

The only truly disputed issue at trial was Lerma's *mens rea*—there was no question that she was present when Alvarado and his companions entered Gonzales's home. As discussed above, the State presented strong evidence that Lerma intended to aid Alvarado, including phone records showing calls between Lerma and Alvarado shortly before the

9

shootings, a Snapchat conversation in which Lerma demands a television, Lerma's initial denial that she went to Gonzales's home, and Lerma's admissions during her second police interview that she knew Alvarado intended to rob Gonzales and that she ran away as soon as Alvarado entered Gonzales's home and did not call the police.

In addition, none of the evidence in the record before us suggests that Alvarado caused bodily injury with a culpable mental state less than intentionality. Instead, the evidence shows that Alvarado intended to "beat up" and "rob" Gonzales, that he rushed into Gonzales's home, and that he fatally shot both Gonzales and Martinez. Therefore, there was little danger of the jury returning a guilty verdict despite finding that Alvarado (and, by the law of parties, Lerma) acted with mere recklessness.

For these reasons, we conclude that the state of the evidence weighs heavily against a finding of egregious harm.

*Arguments of Counsel and Other Information in the Record*

During the State's closing argument, the prosecutor stated that it was the jury's role to decide "what weight to give what evidence" and that it must make its decision "based on the evidence [it] heard in trial." The prosecutor emphasized that the jury's "big decision" would be whether Lerma acted with the intent "to promote or assist the unlawful entry into [Gonzales's] home so that a robbery could be accomplished." The prosecutor also described in detail the evidence that Lerma intended to assist the burglary. Nothing the prosecutor said exacerbated any harm the jury charge errors may have caused. For example, the prosecutor never argued that the jury could find Lerma guilty if it concluded that Alvarado recklessly caused bodily injury to Gonzales.

10

During his closing argument, Lerma's counsel explained intentionality as follows:

> So you're going to have to find—if you're going to find Ms. Lerma guilty, you're going to have to find beyond a reasonable doubt that it was her conscious objective to assist in this robbery. It wasn't her conscious objective just to go over there and get some marijuana. Regardless of what she knew about the bad blood between the parties, was it her—you have to decide beyond a reasonable doubt that it was her conscious objective to assist in this robbery and assist by going into the house and providing them with a way to get in.

These statements, which Lerma does not complain about on appeal, explained to the jury the necessary findings concerning intentionality and are consistent with the application paragraph in the jury charge.

We are not aware of any other information in the record before us that is relevant to our harm analysis. Accordingly, we conclude that the arguments of counsel and other relevant information weigh against a finding of egregious harm.

*Summary of Harm Analysis*

Having concluded that the entirety of the jury charge weighs slightly in favor of a finding of harm, that the state of the evidence weighs heavily against a finding of harm, and that the arguments of counsel and other information in the record weigh against a finding of harm, we hold that the alleged jury charge errors about which Lerma complains did not cause her egregious harm. Accordingly, we overrule her third through eighth points of error.

**CONCLUSION**

We affirm the trial court's judgment of conviction.

11

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed on Motion for Rehearing

Filed:   March 26, 2020

Do Not Publish